IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

SERVICEMASTER COMPANY and        )
THE TERMINIX INTERNATIONAL       )
COMPANY LIMITED PARTNERSHIP,     )
                                 )
     Plaintiffs,                 )
                                 )        No. 12-cv-2788 Ma/P
v.                               )
                                 )
THOMAS D. TESH,                  )
                                 )
     Defendant.                  )

_____

**ORDER DENYING PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY
RESTRAINING ORDER
AND
ORDER COMPELLING ALL PARTIES TO ENGAGE IN ARBITRATION**

_____

Before the court is the Emergency Motion for Temporary Restraining Order ("Motion for TRO") filed by plaintiffs ServiceMaster Company ("ServiceMaster") and The Terminix International Company Limited Partnership ("Terminix"). (ECF No. 2.) Through their motion, the plaintiffs seek to enforce noncompete and confidentiality agreements against Terminix's former Director of Business Solutions, defendant Thomas D. Tesh, while Terminix and Tesh engage in binding arbitration before the American Arbitration Association ("AAA").[1]  Specifically, the plaintiffs

_____

[1]As discussed in greater detail below, Terminix and Tesh signed an arbitration agreement in 2003, which requires them to arbitrate all of the claims at issue in this case.  ServiceMaster, however, has

seek an order enjoining Tesh, who notified Terminix of his resignation on August 20, 2012, from starting his new job as Assistant Vice President of Information Technology ("IT") with one of their main competitors, Rollins, Inc. ("Rollins").[2] Plaintiffs also ask the court to enjoin Tesh from using any nonpublic Terminix information or disclosing such information to third parties. The requested TRO would extend not only to Rollins, but also to Orkin, LLC ("Orkin"), a subsidiary of Rollins which competes nationally with Terminix in the termite and pest control business. Plaintiffs contend that "[s]hould the restrictive covenants be ignored and Defendant be permitted to work for Plaintiffs' direct competitor (especially in a similar capacity), Defendant can and will use the protected confidential information to compete against Plaintiffs. . . . Allowing Defendant to engage in unfair competition with Plaintiffs is not consistent with the parties' agreement, equity or the cases by which this Court is bound to follow." (ECF No. 35 at 3-4.)

---

taken the position that because it was not a signatory to the arbitration agreement, it cannot be compelled to engage in the arbitration proceedings pending before the AAA. The parties' efforts to move forward with arbitration have stalled, in part, due to their disagreement over whether ServiceMaster should be required to participate in the arbitration proceedings.

[2]Tesh's resignation from Terminix was effective September 30, and he was scheduled to start working for Rollins at the beginning of October. However, the parties have agreed that Tesh would not perform any work for Rollins, and Terminix would continue paying Tesh his salary and health benefits, while the court has the present motion under advisement.

On October 5, 2012, the parties appeared for a conference before the District Judge, at which time they consented to the exercise of jurisdiction by the Magistrate Judge for purposes of deciding the Motion for TRO and all issues raised in connection with the motion, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.[3] The undersigned conducted a hearing on October 10, 11, and 12. Present were attorneys Leo M. Bearman, Jr., Mark Glover, Louis P. Britt, III, and Victoria Holladay for the plaintiffs, and Thomas L. Henderson and Rodrick D. Holmes for Tesh. The court received into evidence thirty-five exhibits and heard testimony from Fred Strickland (Vice President of Service and Administration for Terminix), computer forensic examiner Jeffrey E. Tuley, Lee Crump (Group Vice President and Chief Information Officer ("CIO") for Rollins), and Tesh.[4] In connection with the Motion for TRO, the parties filed the following additional briefs and documents: Defendant's Motion to Dismiss (ECF No. 8); Defendant's Memorandum of Law in Support of its Motion to Dismiss and in Opposition to

_____

[3] 28 U.S.C. § 636(c) provides that a Magistrate Judge may conduct "any or all proceedings" in a jury or nonjury civil matter with the consent of the parties, which includes "partial" or "limited" consent to have a Magistrate Judge decide dispositive motions within a case. See Barron v. PGA Tour, Inc., 670 F. Supp. 2d 674, 677 n.2 (W.D. Tenn. 2009) (Pham, M.J.) (citing cases).

[4] Among the exhibits admitted at the hearing were three emails sent by upper level managers at ServiceMaster, in which they apparently seek Tesh's insight regarding Rollins and also discuss pricing information for Orkin. (TRO Hr'g, Exs. 18, 19, 20.) Tesh testified that someone had secretly dropped off copies of these emails in his hotel room while he was in court for the TRO hearing. Tesh testified that he did not know who placed these emails in his room.

Plaintiffs' Emergency Motion for Temporary Restraining Order (ECF No. 9); Defendant's Supplemental Memorandum of Law in Support of its Motion to Dismiss and in Opposition to Plaintiff's Emergency Motion for Temporary Restraining Order (ECF No. 18); Plaintiffs' Corrected Supplemental Memorandum in Support of Motion for Temporary Restraining Order Regarding Court's Jurisdiction and Validity of Contracts at Issue (ECF No. 19); Plaintiffs' Status Report (ECF No. 21); Defendant's Second Supplemental Memorandum in Support of Defendant's Motion to Dismiss Plaintiffs' Complaint and in Opposition to Plaintiffs' Motion for Temporary Restraining Order (ECF No. 34); Plaintiffs' Second Supplemental Memorandum in Support of Plaintiffs' Motion for Temporary Restraining Order Regarding Confidential Information as Protectable Interest (ECF No. 35); the Declaration of Richard V. Pacella, President of Velocitor Solutions (ECF No. 36); the Declaration of Brian Burns, ServiceMaster's Information Security Manager (ECF No. 39); the Declaration of Richard J. Cherry, Tesh's direct supervisor (ECF No. 40); and Plaintiffs' Third Supplemental Memorandum in Support of Plaintiffs' Motion for Temporary Restraining Order Regarding Compelling a Nonsignatory to an Arbitration Agreement Into Arbitration (ECF No. 42). With leave of court, the parties filed post-hearing proposed findings of facts and conclusions of law (ECF Nos. 48, 49). On October 30, the plaintiffs filed a Notice of Correspondence Between the Parties Concerning Defendant's Proposed Findings of Fact (ECF

No. 55), in which they allege that certain facts contained in Tesh's proposed findings of fact are inaccurate.

The court, having now considered the parties' filings, the evidence presented at the TRO hearing, the transcripts from the hearing, and the applicable law, hereby denies the Motion for TRO. In reaching this conclusion, the court gives considerable weight to the testimony of Tesh, who the court finds to be credible. The court further orders all parties to engage in arbitration.

## I.  FINDINGS OF FACT

ServiceMaster is a Delaware corporation with its principal place of business in Memphis, Tennessee. Through its subsidiaries, ServiceMaster provides a variety of commercial and residential services nationally, including pest and termite control. ServiceMaster is the indirect parent of Terminix, a Delaware limited partnership which maintains its principal place of business in Memphis. Terminix provides termite and pest control services across the United States. In 2002, Terminix began development of a handheld-based mobility system that it referred to as the Terminix Mission System ("Mission System"). Lee W. Crump, who was Terminix's Vice President and CIO in 2002, was the person primarily responsible for the design, programming, and implementation of the Mission System.[5] Terminix began "rolling out" the Mission System

_____

[5]Crump was Terminix's CIO from November 1998 through August 2007. His position with Terminix was terminated in August 2007, shortly after Terminix was acquired by a private equity group. In June 2009, he was hired by Rollins as Vice President, Program Management

in 2002 and completed the rollout at all of its branch locations by 2004. Since 2004, Terminix has spent approximately $40 million in its Mission System and related mobility initiatives and platforms.[6] Terminix continues to use the Mission System today.

The Mission System was designed to allow for the recording and transmission of customer data, preferences, contracts, services, and other valuable customer information among Terminix employees through the use of mobile handheld devices. Terminix contracted with Velocitor Solutions ("Velocitor"), a third-party vendor, to supply the handheld devices, assist in developing the program, and provide support services on an ongoing basis.[7] Velocitor facilitates the communication of information from the handheld devices to Terminix's central network by receiving the information submitted through the devices and then communicating the information to the Mission System. The Mission System stores the

_____

Office. In November 2009, Crump was promoted to Group Vice President and given responsibility for directing all project management operations, IT, and field administration support. He was named CIO of Rollins in July 2010.

[6]Plaintiffs spend $2.5 to $3.5 million annually on their mobility initiatives.

[7]ServiceMaster and Velocitor entered into a Master Services Agreement and an Agreement for Depot Services and Hardware Maintenance in 2009, which related to the implementation and support of Terminix's mobility system. These agreements contained confidentiality provisions governing the nondisclosure of both parties' confidential information. The Master Services Agreement expired in 2010 and the Agreement for Depot Services and Hardware Maintenance expired in 2012. However, Velocitor is still providing Terminix with ongoing support for the Mission System.

information, which allows Terminix employees to access valuable customer information through the devices, such as customer preferences, service schedules, payments received, and treatments applied. As services are rendered, information is communicated back and forth through the devices, and ultimately all of the information is transmitted back to the Mission System through Velocitor. This mobility system allows Terminix to improve customer experience by ensuring services are rendered as promised. It also allows for efficient record keeping and employee monitoring. Although the Mission System uses hardware and operating systems that are available to the general public, the software program was custom written by Terminix employees in developing the Mission System.[8] This in-house program is considered proprietary information by the plaintiffs.

Thomas Tesh is a self-taught project manager. He does not have a college degree, nor does he have any formal education or training in project management, software development, or IT. Instead, he has developed his project management skills over the years through his on-the-job experience and by studying "A Guide to the Project Management Body of Knowledge," a book of best practices for project managers published by the Project Management Institute, Inc. From 2000 to 2003, Tesh worked for Signature Consultants, a

---

[8]The Mission System uses an IBM iSeries AS400 hardware platform, Lansa code generator programming language, OS400 Operating System, DB2 relational database manager, and green screen user interface.

third-party consultant that was hired by Terminix to prepare Terminix employees for the rollout of the Mission System.[9] Tesh's primary role was to train Signature Consultants's trainers on how to use the Mission System, so that those individuals could in turn train Terminix employees. The training he provided included instructions on how to do a work order, schedule work, and enter sales into the system. Although Tesh had access to Terminix's confidential information that was captured by the Mission System, he had no confidentiality agreement with Terminix or ServiceMaster while working for Signature Consultants.

Tesh is married to Nikole Day, who is the niece of Crump's ex-wife. Through his relationship with Day, Crump became friends with Tesh. Crump and Tesh, along with Nikole Day's brother, Christopher Day, often played golf together. In February 2003, Crump hired Tesh, Nikole Day, and Christopher Day, as Mission System trainers.[10] Tesh's official title was Regional IT Specialist, which involved performing basically the same duties that he performed while working for Signature Consultants. On February 17, 2003, Tesh entered into an employment contract with Terminix ("2003

_____

[9]Prior to working for Signature Consultants, Tesh worked as a restaurant manager.

[10]In total, sixteen individuals were hired in 2003 as Mission System trainers. Christopher Day later left Terminix to become a Training Specialist for Velocitor. Executives at Terminix, including Albert Cantu (President of Terminix) and Bill Young (Vice President of Human Resources for Terminix), were fully aware of Crump's relationship to Tesh and the Days before they were hired.

Contract"). The 2003 Contract includes a nondisclosure agreement, a covenant not to compete, and an arbitration agreement. The nondisclosure agreement states in relevant part as follows:

> **3. Proprietary Information Agreement.** The Employee acknowledges that during the course of employment by the Company [Terminix], the Employee will have contact with customers and potential customers of the Company and will establish good will with such Customers and potential Customers on behalf of the Company. In addition, the Employee acknowledges that he may have access to, and/or the Company may confide to the Employee, certain facts, formulas, theories, methods, specifications, products, books, notebooks, leads, lead logs, manuals, customer listings, certificates, records, contracts, inventions, ideas, processes, data, know-how, techniques, accounts, sales materials, rate books, business plans, prices and costs, and other information that has or will have actual or potential economic value in the business in which the Company is engaged [referred to as "Proprietary Information"] . . . . The Employee agrees that at all times, both during his employment and after his employment with the Company cease for any reason, whether voluntary or involuntary, the Employee: (A) will keep in confidence and trust all Proprietary Information and will not, directly or indirectly, use or disclose to any person or entity of any kind any Proprietary Information without the prior written consent of the Company, except as may be necessary in the ordinary course of performing his duties as an employee of the Company; (B) will report to the Company all unauthorized disclosures or uses of Proprietary Information which come to the Employee's attention; and (C) will not acquire any Proprietary Information by improper means.

(TRO Hr'g, Ex. 1.)  The noncompete provision provides in part as follows:

> **4. Restrictive Covenants.** The Employee agrees that during the period of employment by the Company and for a period of eighteen (18) months after the Employee ceases to be employed by the Company for any reason, whether voluntary or involuntary, the Employee will not directly or indirectly . . . (A) offer to any person or entity of any kind, products or services similar to or competitive with the products and services offered by the Company, or

otherwise compete with the Company, within any county in which the Employee was assigned or performed services on behalf of the Company during the eighteen (18) month period immediately prior to the termination of his employment with the company, and outside of any such county within a one hundred (100) mile radius from any border of any such county; (B) provide products or services similar to or competitive with products or services offered by the Company to any customer of the Company to which the Employee provided products or services on behalf of the Company or any potential customer of the Company that was solicited by the Employee on behalf of the Company during the eighteen (18) month period immediately prior to the termination of his employment with the Company . . . .

In connection with the protection afforded the Company by the covenants set forth above within this paragraph 4, Employee acknowledges and agrees that the Company's need for the covenants is based on the following: (a) the Company has expended or will expend substantial time, money and effort in training the Employee in the business of the Company; (b) Employee will, in the course of his employment, be personally entrusted with and exposed to Proprietary Information and the Company's customers; (c) the Company, during the term of this Agreement and after its termination, will be engaged in a highly competitive services industry in which many firms, including the Company, compete; (d) Employee could, after having accessed the Proprietary Information and Company's customers while in performance of his obligations under this Agreement, become a competitor; and (e) the Company will suffer great loss and irreparable harm if, after the Employee ceases to be employed by the Company for any reasons, whether voluntary or involuntary, the Employee were to directly or through the activities of any third person, enter into competition with the Company.

(Id.) The arbitration provision contained in paragraph 5 of the 2003 Contract, titled "Agreement to Mediate and Arbitrate," provides that the parties must attempt to mediate their employment disputes, and if mediation is unsuccessful, that "any and all controversies between [the Employer and Employee] will be submitted for resolution to binding arbitration in accordance with the

attached Arbitration Agreement . . . . [A]rbitration will be the exclusive forum for resolving disputes between them, including statutory claims and all disputes arising out of the employment relationship and the termination of such relationship."[11]  (_Id._) In a separate document titled "Terminix Arbitration Agreement" ("Arbitration Agreement"), Terminix and Tesh agreed that "[a]ny dispute arising out of Employee's employment with Employer, including termination of employment and all statutory claims, will be submitted to binding arbitration administered by the [AAA] under its National Rules for the Resolution of Employment Disputes, or as mutually agreed."  (ECF No. 18-1.)  The Arbitration Agreement states that "[t]he parties understand that, except as otherwise provided by law, this Agreement applies to all claims, including, but by no means limited to, claims for breaches of any contract (express or implied), discrimination, torts, and/or claims based upon any federal, state or local ordinance, statute, regulation, constitutional provision, or any other law."  It further states that "[t]he parties are entitled to all remedies allowed by statute that would have been available had the party brought the matter in court including but not limited to preliminary and other injunctive relief for violations of the terms of this Agreement."  Tesh signed both the 2003 Contract and the Arbitration Agreement.  The 2003

---

[11]The parties, including nonparty Rollins, engaged in private mediation on October 4, 2012.  They were unable to resolve their claims through mediation.

Contract and Arbitration Agreement were signed by Crump on behalf of Terminix.[12]

In addition to the Arbitration Agreement, ServiceMaster instituted a dispute resolution plan that it referred to as the We Listen Dispute Resolution Plan ("We Listen Plan"). (Compl. Ex. 4.) On December 1, 2011, Tesh electronically acknowledged receipt of the plan. The We Listen Plan's stated purpose is to

> provide an exclusive, easy-to-use, three-step program for economical and prompt resolution of claims or controversies ("Disputes") between The ServiceMaster Company, including its subsidiaries and affiliates (the "Company") and all present and former employees and applications for employment (collectively "Associates"). <u>The Plan includes a mutual agreement to arbitrate covered Disputes which is the exclusive, final and binding remedy for both the Company and me and me a class action waiver.</u> I understand that neither the Company nor I will be allowed to bring any Disputes to a court or jury for a resolution except as set forth in the Plan.

(<u>Id.</u>) (emphasis in original).[13] The We Listen Plan further provides that ServiceMaster, its subsidiaries, and Tesh mutually consent to resolve through binding arbitration with the AAA all disputes relating to Tesh's employment and termination of his employment, and that the plan covers legal claims that ServiceMaster, its

_____

[12]Paragraph 6 of the 2003 Contract requires Tesh, upon termination from employment, to return Terminix property issued to him during his employment. Paragraph 7 requires an "Exit Interview" before leaving his employment: "[p]rior to the time that employment with the Company ceases for any reason, whether voluntary or involuntary, the Employee agrees to meet with a designated representative of the Company to review the Employee's obligations under this Agreement."

[13]An earlier version of the We Listen Plan from 2009 contained a similar arbitration provision.

subsidiaries, or Tesh could bring relating to his employment and termination.

In 2004, Tesh was promoted to Director of IT. Throughout his time at Terminix, Tesh's responsibilities included ensuring projects were completed, facilitating meetings between and among vendors and Terminix employees, and performing other duties associated with general project management. Tesh worked closely with Strickland to initially launch and later upgrade the Mission System, and Tesh acted as the lead manager or co-lead manager on those projects.[14] He was also responsible for bringing in third-party vendors, managing the work of those vendors and Terminix employees, and installing in-truck printing for Terminix service technicians. Further, Tesh had input on various design elements of the mobility platforms, including how information was displayed on the screens of the handheld devices. Strickland described Tesh's overall responsibilities as follows:

> Q. Mr. Strickland, could you give us an overview of Mr. Tesh's duties and responsibilities at Terminix?
>
> A. His most recent responsibilities were to help us launch and complete the mobility platforms. As I mentioned a moment ago, there was an initial phase, Version 1, of service; then we launched sales and then Version 2 of service and the beginning of the merging of those two platforms for efficiency.
>
> Q. What does that require? What was he doing for terminix?

---

[14]Tesh also served as lead project manager for several key mobility initiatives for The TruGreen Company, a subsidiary of ServiceMaster that provides lawn care services.

A.  Thomas was in charge in regard from my perspective of what he and I communicated on and worked together with was in regards to what the needs and desires were for the mobility platform, not only in what we did to face that customer but also the reporting requirement or information that was gathered, that it was in the handheld correctly, screen shots were correct, and the beginning of those programs would start at the beginning and continue to work.  He would bring in third-party vendors to help us do that to not only work through it but also manage the process.  And then when it became time to roll out, he either directed the rollout with a third party team or an internal team that were in a sense put underneath him for a period of time to roll that out to completion.

Q.  What involvement did he have in - I think you mentioned about the third-party vendor and making sure the appropriate data was gathered.  Can you explain that in more detail?

A.  Sure.  As we began to look at, not only the platform, but the improvement of our platform from Version 1 to say Version 2 for just description purposes, we had to see where we were on the handhelds and what handhelds would be used.  So he would, not only in discovering which handheld or technology was available, but which one maybe fit our needs on what we were trying to do with our current platform, with our Mission system, and what we were trying to do in communication with our vendors.  So he was able to decide that.

He was also able to work with the vendors themselves, whether it's Velocitor or Intermec or other different companies, that we needed to sort of tie all these together.  He was there, our liaison and working with them, communicated with them, helped them build our what we call story boards.  Story boards are the screen shots in the handhelds so it gives you a sequence of flow, name and address, time of material used, where did you use it, all that was in the screen shots built in the handheld and he helped manage that in conjunction with the vendor to what we needed as an end product for our service mobility.

(TRO Hr'g Tr. 61:4-63:4, Oct. 10, 2012.)

Although Tesh was involved with the overall design and implementation of the mobility platforms, he was not involved with writing the programs for the platforms. Tesh's job duties did not include any customer interaction or sales responsibilities. While Tesh had access to Terminix's customer and pricing information, this access was not for purposes of customer sales or retention, or for strategic planning. Instead, he had to run this information through the Mission System in order to develop, troubleshoot, and improve the mobility system.[15] He did have access to Terminix's 2012 IT strategic plan via an email he received from Rich Cherry, ServiceMaster's Vice President of IT. However, Tesh never actually reviewed the plan.

While employed at Terminix, Tesh directly reported to Cherry, who also participated in Tesh's performance reviews. Tesh's performance evaluations and raises were based in part on assessments from Cherry. Tesh's work station in Memphis was located in ServiceMaster's corporate office. He was covered by ServiceMaster's travel policy, his personnel records were controlled by ServiceMaster, and his salary was paid by ServiceMaster.

In 2007, ServiceMaster announced that it was being purchased by a private equity group and would no longer be a publicly traded company. In an effort to retain key employees, in March 2007,

---

[15]Tesh would sometimes use "dummy" customer information to test the mobility system.

ServiceMaster developed a Long-Term Incentive Plan ("LTIP Plan"),
which provided these key employees with the potential for earning
monetary awards based on the company's performance.  The LTIP Plan
was offered to 387 employees, including Tesh, and applied to a
three-year performance period from 2007 to 2009.[16]   After the
performance period ended in 2009, benefits could no longer be
earned by employees under the plan.  On March 30, 2007, Tesh signed
a three-page ServiceMaster Long-Term Incentive Plan Participation
Unit Award Agreement ("LTIP Agreement").   The LTIP Agreement
contained the following restrictive covenants:

> 3.   <u>Agreements of Holder; Forfeiture of Units</u>.
>
> (a)  From and after the Grant Date and through and
> including the date that is 18 months after the effective
> date of the Holder's termination of employment, Holder
> shall not do any of the following:
>
>> (1)  directly or indirectly (whether as owner,
>> stockholder, director, officer, employee,
>> principal, agent, consultant, independent
>> contractor, partner or otherwise), in North
>> America or any other geographic area in which
>> the Company is then directly or indirectly
>> conducting business, own, manage, operate,
>> control, participate in, perform services for,
>> or otherwise carry on, a business similar to
>> or competitive with the business conducted by
>> the Company or any subsidiary of the Company;
>>
>> (2)  directly or indirectly attempt to induce
>> any employee of the Company or any subsidiary
>> of the Company to terminate his or her
>> employment for any purpose whatsoever, or
>> attempt directly or indirectly to solicit the
>> trade or business of any current or

---

[16]In 2007, Terminix had over 12,000 employees, and ServiceMaster had
approximately 29,000 employees.

prospective customer, supplier or partner of
the Company or any subsidiary of the Company;
or

(3) directly or indirectly engage in any
activity which is contrary, inimical or
harmful to the interests of the Company or any
subsidiary of the Company, including but not
limited to (i) violations of policies of the
Company or any subsidiary of the Company, (ii)
disclosure or misuse of any confidential
information or trade secrets of the Company or
a subsidiary of the Company, (iii) engaging in
conduct related to employment for which either
civil or criminal penalties may be sought.

(b) The Holder acknowledges that any breach of Section
3(a) will result in serious and irreparable injury to the
Company for which the Company cannot be adequately
compensated by monetary damages alone. The Holder
agrees, therefore, that, in addition to any other remedy
the Company may have, the Company will be entitled to
seek both preliminary and permanent injunctive relief (to
the extent permitted by law) without the necessity of
proving actual damages and/or posting of a bond.

(TRO Hr'g, Ex. 2.) As part of the LTIP Plan, each eligible
employee was awarded a certain number of "units." Tesh was awarded
27 units, which translated to a maximum potential monetary award of
$2,700. In 2007 and 2008, ServiceMaster and its subsidiaries met
the LTIP Plan's objective metrics, but failed to meet them in 2009.
Approximately thirty employees, all of whom left the company in
2008, received payouts based on the two-year metrics as provided in
Section 3.5 of the plan. However, after the plan expired in 2009
and the company's goals were not achieved, Tesh forfeited his units
and, as a result, he did not receive any payouts under the plan.

Tesh received positive evaluations while employed at Terminix.
For example, in 2006, Crump performed Tesh's annual review and

wrote that "Thomas combines what he knows about our company with what he knows about competitors to come up with realistic strategic plans. He is very familiar with our strengths and weaknesses, as well as those of the competitors and potential allies. Thomas has a solid understanding of our company. He is tuned into our weaknesses and strengths and is able to identify where we need to improve in order to beat our competitors." (Ex. 4 at 7.) In 2010, Strickland gave Tesh a strong evaluation and requested that Tesh be placed in an advanced placement program in management. (Ex. 3.) In July 2012, Tesh was promoted to Director of Business Solutions and given a pay increase. His annual salary at that time was $160,000, plus a potential bonus of 25%. However, there were no changes to his prior job duties.[17]

During the time he worked for Terminix, Tesh resided in Fort Mill, South Carolina, and performed work for Terminix out of his home. However, his job required frequent travel, not only to ServiceMaster's corporate office in Memphis, but also to work sites in Florida, Texas, Tennessee, South Carolina, and California. In 2011, Tesh made 88 business trips on behalf of Terminix, and in 2012, he made over 60 trips.

The extensive traveling took a toll on Tesh's marriage. In addition, Tesh became concerned about the financial condition of

---

[17]In 2008, Terminix began outsourcing its IT work to India. As a result, from 2008 through the middle of 2012, Tesh held the position of "Business Consultant," which involved basically the same project management duties that he performed previously.

Terminix and his future with the company.  As a result, in early 2012, Tesh began looking for other employment.  He wanted to find a job that did not involve much traveling and would provide him with better career opportunities.  While looking for a new job, Tesh attempted to determine whether he had a noncompete agreement. He contacted the human resources department and requested a copy of his personnel file, but never received a response.  He heard second hand from Cherry and other upper level managers that they did not believe he had a noncompete agreement.

In or around August 2012, Tesh contacted Crump to apply for a job with Rollins, which is located in Atlanta, Georgia.  Crump offered him a position with Rollins as Assistant Vice President of IT, which Tesh accepted.[18]  His responsibilities in this position would involve managing the rollout of Rollins's new mobility system, which Rollins hopes to have up and running by the beginning of 2013.  Rollins's new mobility system is distinct from and incompatible with Terminix's software and mobility system. Rollins's system operates on a software package that it purchased in 2010 from a third-party vendor.[19]  The Rollins system uses SQL

_____

[18]As mentioned earlier, Rollins and Terminix are direct competitors at the national level.  According to Pest Control Technology's 2012 Industry Report, in 2011 Rollins had $1.205 billion in revenue, while Terminix (excluding revenue of its franchisees) had $1.193 billion in revenue.  With franchise revenue included, Terminix's 2011 revenue was $1.299 billion.

[19]This third-party software program is used by other pest control companies across the country.

servers as the hardware platform, Microsoft.Net as the program language, SQL server operating system, SQL relational database manager, and web browser GUI user interface. The hardware and development components of the Rollins system are completely different from those used in the Mission System. The data file structures are unique and cannot be shared between the systems. Rollins has invested nearly $10 million in its new mobility system, and has entered into a contract with Velocitor for mobility device products and services.[20] Tesh's annual salary would be $160,000, and he would work primarily from Rollins's office in Atlanta, with travel limited to about one business trip per month.

In preparation for his resignation from Terminix, Tesh took steps to transfer Terminix documents that were stored in his virtual "DropBox" account back to the ServiceMaster network.[21] Tesh had set up his DropBox account in July 2011, so that he could store

---

[20]Tesh was not involved with any of the contract negotiations or discussions between Rollins and Velocitor. Plaintiffs have submitted several emails from March and July of 2011, which they allege demonstrate that Tesh, while employed at Terminix, set up meetings between Crump and Christopher Day. As demonstrated at the hearing, Crump, Tesh, and Day are related and have remained friends even though Crump and Day no longer work for Terminix. The emails in question relate to golf trips planned by the men, not meetings to discuss confidential information about the plaintiffs.

[21]DropBox is a file hosting service operated by Dropbox, Inc., that offers cloud storage, file synchronization, and client software. Dropbox allows users to create a special folder on each of their computers, which Dropbox then synchronizes so that it appears to be the same folder (with the same contents) regardless of the computer it is viewed on. Files placed in this folder are also accessible through a website and mobile phone applications.

both personal and business documents online.  This account enabled
him to access these documents while he traveled.  He also used his
DropBox account to store Terminix and Velocitor documents while he
worked on the mobility system, because the companies' computer
networks would not allow for the direct transfer of data between
the networks.  The majority of the work-related documents that Tesh
stored in his DropBox account were ServiceMaster Acceptance
Corporation customer files ("SMAC files"), which contained
confidential customer information and were used by Tesh to develop
and test the mobility system.  Tesh advised his supervisor, the
legal department, and the security department about his use of the
DropBox account for storing Terminix documents.  Moreover, each
time Tesh transferred SMAC files, he sent an email to ServiceMaster
security and other Terminix employees to notify them of the
transfer.  Despite Terminix's knowledge of Tesh's regular use of
his DropBox account, he was never instructed to stop using that
account.[22]  On August 18, 2012, two days prior to announcing his
resignation, Tesh transferred over 16,800 Terminix and
ServiceMaster documents (mostly SMAC files) from his DropBox
account to the ServiceMaster network.  Tesh then deleted all
remaining Terminix and ServiceMaster documents from his DropBox
account.  On August 19, he deleted the link connection to his
DropBox account and his DropBox folder from his laptop.  Tesh has

[22]According to Tesh, his supervisors at Terminix also maintained
their own DropBox accounts to store company documents.

not retained any of these documents, nor has he provided them to Rollins.[23]    Tesh did, however, keep a few records for his own "protection."    Notably, he kept copies of the Master Services Agreement and the Depot Agreement between ServiceMaster and Velocitor, because the agreements had expired - thereby exposing ServiceMaster to the risk that Velocitor could abruptly stop supporting the mobility system.    According to Tesh, he wanted to have proof that he tried to get ServiceMaster to enter into a new contract.[24]

On August 20, 2012, Tesh met with Cherry and submitted his letter of resignation.    Tesh told Cherry that he was going to work for Rollins in Atlanta as a project manager.    Linda Goodspeed, Senior Vice President and   CIO of ServiceMaster, attempted to convince Tesh to stay by presenting him with a written offer to

---

[23]According to plaintiffs' computer forensic examiner, Jeffrey E. Tuley, he examined Tesh's work computer and found that a number of ServiceMaster and Terminix documents that had been stored in Tesh's DropBox account were not transferred back to the ServiceMaster network.  Some of these documents had titles such as "2011 abp master file - tmx dec estimate 10 jan dg.xlsx," "servicemaster intermec agr exh e final.doc," "tmx mobile computers hardware spec 031406 r4.2 mbp.xls," " sales mobility app issues log.xlsx," "sales mobility training plan.xlsx," and "C:\Users\teshtd01\Dropbox\Sale Mobility - MASTER\Sales Mobility 2 - Relevant Info\ipad2".  Tuley also testified that Terminix's mobility system "issue log," which records problems found in the software, was at one time in the DropBox account but was not returned to the ServiceMaster network. From this testimony, the plaintiffs contend that Tesh could have kept these documents for himself or shared them with Rollins. However, Tesh testified that he did not retain any of these documents or share them with Rollins.

[24]Tesh turned over these documents to his attorney at some point prior to the TRO hearing.

increase his salary and a retention bonus.  Tesh declined the

offer.  Tesh subsequently sold his home in South Carolina, and

moved his family to Atlanta.  On September 12, 2012, the plaintiffs

filed their Complaint for Injunctive Relief and Motion for TRO.[25]

In their Motion for TRO, the plaintiffs seek an injunction to

prohibit Tesh from starting his new job with Rollins and from using

plaintiffs' confidential information, while Terminix and Tesh

engage in arbitration.  Plaintiffs argue that they are likely to

succeed in enforcing the noncompete agreements contained in the

2003 Contract and LTIP Agreement, and that they will suffer

irreparable harm if the court does not prohibit Tesh from working

for Rollins.

## II.  CONCLUSIONS OF LAW

### A.  Preliminary Issues

Before addressing the merits of the Motion for TRO, the court

will first consider two threshold issues raised by the parties in

their briefs: (1) whether this court has subject matter

jurisdiction to decide the Motion for TRO, and (2) whether

ServiceMaster must engage in arbitration.

### 1.  Subject Matter Jurisdiction

First, Tesh argues that the court lacks subject matter

jurisdiction to entertain the Motion for TRO because the parties

---

[25]On September 12, Tesh came to Memphis for his exit interview and
to return Terminix's property, including his laptop computer.  At
the conclusion of the interview, ServiceMaster's Vice President of
Legal, Marcus McDaniel, served Tesh with the complaint.

agreed to arbitrate all of the claims raised in this litigation, including the plaintiffs' request for preliminary injunctive relief. Tesh points to the Arbitration Agreement, which states that "[t]he parties are entitled to all remedies allowed by statute that would have been available had the party brought the matter in court including but not limited to preliminary and other injunctive relief for violations of the terms of this Agreement." This language, however, merely describes the various forms of relief available to the parties in arbitration; it does not limit the parties' right to seek preliminary injunctive relief through the courts.

In <u>Performance Unlimited v. Questar Publishers, Inc.</u>, 52 F.3d 1373 (6th Cir. 1995), the Sixth Circuit held that "in a dispute subject to mandatory arbitration under the Federal Arbitration Act ["FAA"], a district court has subject matter jurisdiction under § 3 of the Act to grant preliminary injunctive relief provided that the party seeking relief satisfies the four criteria which are prerequisites to the grant of such relief." <u>Id.</u> at 1380. The court went on to emphasize that "a grant of preliminary injunctive relief pending arbitration is particularly appropriate and furthers the Congressional purpose behind the [FAA], where the withholding of injunctive relief would render the process of arbitration meaningless or a hollow formality . . ." <u>Id.</u> The overwhelming majority of courts from other circuits follow this approach. <u>See</u> <u>Janvey v. Alquire</u>, 647 F.3d 585, 595 (5th Cir. 2011) (holding that

the district court had authority to preserve the status quo before deciding the motion to compel arbitration "and by doing so they sought to preserve the meaningfulness of any arbitration that might take place"); <u>Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire North Am., Inc.</u>, 609 F.3d 975, 981 (9th Cir. 2010) ("[W]e conclude that a district court may issue interim injunctive relief on arbitrable claims if interim relief is necessary to preserve the status quo and the meaningfulness of the arbitration process - provided, of course, that the requirements for granting injunctive relief are otherwise satisfied."); <u>Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 910 F.2d 1049, 1052-54 (2d Cir. 1990) (a district court has the power to issue an injunction pending arbitration, even absent express contractual language so providing); <u>Ortho Pharm. Corp. v. Amgen, Inc.</u>, 882 F.2d 806, 813-14 (3d Cir. 1989) (a district court has jurisdiction to issue injunctive relief pending arbitration, provided that the movant satisfies the four-part preliminary injunction test); <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dutton</u>, 844 F.2d 726, 727 (10th Cir. 1988) (affirming the district court's grant of preliminary injunction to preserve the status quo until arbitration panel takes jurisdiction); <u>Teradyne, Inc. v. Mostek Corp.</u>, 797 F.2d 43, 51 (1st Cir. 1986) ("We hold, therefore, that a district court can grant injunctive relief in an arbitrable dispute pending arbitration, provided the prerequisites for injunctive relief are satisfied. We believe this approach reinforces rather than detracts from the

policy of the Arbitration Act . . . ."); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley, 756 F.2d 1048, 1052 (4th Cir. 1985) ("We do not believe that Congress would have enacted a statute intended to have the sweeping effect of stripping the federal judiciary of its equitable powers in all arbitrable commercial disputes without undertaking a comprehensive discussion and evaluation of the statute's effect. Accordingly, we conclude that the language of § 3 [of the FAA] does not preclude a district court from granting one party a preliminary injunction to preserve the status quo pending arbitration."); Sauer–Getriebe KG v. White Hydraulics, Inc., 715 F.2d 348, 351–52 (7th Cir. 1983) (reversing district court's denial of injunctive relief pending arbitration pursuant to ICC Rules); Amegy Bank Nat'l Ass'n v. Monarch Flight II, LLC, No. 4:11-CV-3218, 2012 WL 1494340, at *8-9 (S.D. Tex. Apr. 27, 2012) (holding that the court may issue a preliminary injunction to preserve the status quo pending arbitration); Fidelity Brokerage Servs. LLC v. McNamara, No. 11 CV 1092 MMA (RBB), 2011 WL 2117546, at *2 (S.D. Cal. May 27, 2011) (holding that the court had jurisdiction to enter injunctive relief to preserve the status quo pending final determination on arbitration). But see Peabody Coalsales Co. v. Tampa Elec. Co., 36 F.3d 46, 47–48 (8th Cir. 1994) (district court may issue injunctive relief in arbitrable dispute only if contract contains "qualifying language" that permits such relief and only if such relief can be granted without addressing merits). Therefore, the court concludes

that it has subject matter jurisdiction to address the Motion for TRO and, if warranted, to enter a TRO to preserve the status quo pending arbitration.

2.  Whether ServiceMaster Must Arbitrate

The FAA's principal purpose is to "'ensur[e] that private arbitration agreements are enforced according to their terms.'" AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740, 1748 (2011) (quoting Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 478 (1989)). Section 2 of the FAA states in relevant part:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The Supreme Court has described this provision "as reflecting both a liberal federal policy favoring arbitration" and the "fundamental principle that arbitration is a matter of contract." Concepcion, 131 S. Ct. at 1745 (internal quotation marks and citations omitted). "The FAA places arbitration agreements on an equal footing with other contracts and requires courts to enforce them according to their terms." Rent-A-Center, W., Inc. v. Jackson, 130 S. Ct. 2772, 2776 (2010) (citing Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443 (2006) and Volt Info., 489 U.S. at 478).

To date, ServiceMaster has resisted arbitration because it contends that its claims are based solely on Tesh's alleged violations of the LTIP Agreement, which does not contain an arbitration provision. This argument, however, ignores ServiceMaster's own We Listen Plan, in which ServiceMaster expressly agreed to arbitrate all disputes relating to Tesh's employment. ServiceMaster admits as much in its complaint. (<u>See</u> Compl. ¶¶ 25-29.) Specifically, the plan requires ServiceMaster to arbitrate all disputes relating to Tesh's employment relationship with the company, including but not limited to, tort and breach of contract claims. The court finds that ServiceMaster's claims based on Tesh's alleged violations of the restrictive covenant in the LTIP Agreement fall within the scope of the plan's arbitration provision.

In addition to the We Listen Plan, the court finds that ServiceMaster must also arbitrate its claims based on the 2003 Contract. As a general rule, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." <u>AT&T Techs., Inc. v. Commc'ns Workers of Am.</u>, 475 U.S. 643, 648 (1986) (citing <u>United Steelworkers of Am. v. Warrior & Gulf Navigation Co.</u>, 363 U.S. 574, 582 (1960)). However, the Sixth Circuit has recognized five theories for binding nonsignatories to arbitration agreements: (1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing/alter ego, and (5) estoppel. <u>Javitch v. First Union Sec.,</u>

<u>Inc.</u>, 315 F.3d 619, 629 (6th Cir. 2003) (citing <u>Thomson-CSF v. Am.</u>
<u>Arbitration Ass'n</u>, 64 F.3d 773, 776 (2d Cir. 1995)). Of these, the
only theory that could apply (based on the current record before
the court) is the estoppel theory.[26] In <u>Javitch</u>, the Sixth Circuit
described the equitable estoppel theory as follows:

> The court in <u>Thomson</u> held that a non-signatory may be
> bound to an arbitration agreement under an estoppel
> theory when the non-signatory seeks a *direct* benefit from
> the contract while disavowing the arbitration provision.
> <u>Id.</u> at 778-79. When only an indirect benefit is sought,
> however, it is only a signatory that may be estopped from
> avoiding arbitration with a nonsignatory when the issues
> the nonsignatory is seeking to resolve in arbitration are
> intertwined with the underlying contract. <u>Id.</u> at 779.
> <u>See</u> <u>Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen</u>,
> 206 F.3d 411, 418 (4th Cir. 2000) (nonsignatory asserting
> breach of contract and breach of contract claims under
> the contract could not avoid the arbitration agreement in
> the contract).

<u>Id.</u> at 624. "[N]onsignatories have been held to arbitration
clauses where the nonsignatory 'knowingly exploits the agreement
containing the arbitration clause despite having never signed the
agreement.'" <u>Comer v. Micor, Inc.</u>, 436 F.3d 1098, 1101 (9th Cir.
2006) (quoting <u>E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber</u>
<u>& Resin Intermediates</u>, 269 F.3d 187, 199 (3d Cir. 2001)); <u>see also</u>
<u>Int'l Paper Co.</u>, 206 F.3d at 418 (stating that "[i]n the
arbitration context, the doctrine [of equitable estoppel]
recognizes that a party may be estopped from asserting that the
lack of his signature on a written contract precludes enforcement

---

[26]The incorporation by reference, assumption, and agency theories
are inapplicable, and Tesh has not provided the court with evidence
to support a veil piercing/alter ego theory.

-29-

of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him.").[27]

Here, the court finds that equitable estoppel principles should apply to prevent ServiceMaster from benefitting from the 2003 Contract (and in turn, the LTIP Agreement) while at the same avoiding the 2003 Contract's arbitration requirement. Although ServiceMaster did not sign the 2003 Contract, the facts show that Tesh was just as much an employee for ServiceMaster as he was for Terminix. ServiceMaster controlled Tesh's employment, as evidenced by the fact that Cherry, his direct supervisor, was a ServiceMaster employee; Tesh's performance evaluations and raises were based in part on assessments from Cherry; Tesh's work station in Memphis was located in ServiceMaster's corporate office; ServiceMaster's travel policy applied to him; his personnel records were controlled by ServiceMaster; his salary was paid by ServiceMaster; and ServiceMaster's Senior Vice President and CIO offered Tesh a raise and retention bonus when he announced his resignation. Additionally, the We Listen Plan, aside from providing an independent basis for requiring ServiceMaster to arbitrate, further

---

[27]Courts have held that a nonsignatory may compel a signatory to an arbitration agreement to arbitrate "when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." Thomson-CSF, 64 F.3d at 779. However, this principle does not apply in cases where, as here, a signatory seeks to compel a nonsignatory to arbitrate.

evidences ServiceMaster's control over Tesh's conditions of employment. ServiceMaster required Tesh to agree to this dispute resolution plan as a condition of his continued employment.[28] To allow ServiceMaster to claim the benefit of Tesh's employment contract and simultaneously avoid its burden "would both disregard equity and contravene the purposes underlying enactment of the Arbitration Act." Int'l Paper Co., 206 F.3d at 418. Accordingly, ServiceMaster must submit its claims to binding arbitration.

## B.   Motion for TRO

"Temporary restraining orders and preliminary injunctions are extraordinary remedies which should be granted only if the movant carries his burden of proving that the circumstances clearly demand it." Ciavone v. McKee, No. 1:08cv771, 2009 WL 2096281, at *1 (W.D. Mich. July 10, 2009) (citing Overstreet v. Lexington-Fayette Urban Cnty. Gov't, 305 F.3d 566, 573 (6th Cir. 2002)); see also Jones v. Caruso, 569 F.3d 258, 265 (6th Cir. 2009); Leary v. Daeschner, 228 F.3d 729, 736 (6th Cir. 2000). Under Federal Rule of Civil Procedure 65, the court must apply a four-factor test to determine whether to issue a TRO.[29] The court must consider: (1) whether the

---

[28]Paragraph 19 of the We Listen Plan states that "if I am a current Associate on the effective date of this Plan revision, I acknowledge that I am already subject to the *We Listen* program, including, but not limited to, its obligation to arbitrate Disputes, and I agree to the Plan as evidenced by my continued employment after receiving notice of this revision to the Plan, and other valuable consideration."

[29]Rule 65 of the Federal Rules of Civil Procedure, under which the plaintiffs seek injunctive relief, governs both TROs and

party seeking the order has shown a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. <u>Third Party Solutions, Inc. v. Express Scripts, Inc.</u>, 298 F. App'x 402, 403 (6th Cir. 2008) (citing <u>Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.</u>, 511 F.3d 535, 542 (6th Cir. 2007)); <u>Overstreet</u>, 305 F.3d at 573; <u>Leary</u>, 228 F.3d at 736. These factors "do not establish a rigid and comprehensive test for determining the appropriateness of preliminary injunctive relief," nor is any one factor controlling. <u>Frisch's Rest. Inc. v. Shoney's, Inc.</u>, 759 F.2d 1261, 1263 (6th Cir. 1984); <u>see also</u> <u>Ne. Ohio Coal. For the Homeless and Serv. Emps. Int'l Union, Local 1199</u>

---

preliminary injunctions. Although the motion before the court is styled a motion for a TRO, the motion is not *ex parte*, as Tesh received notice of the motion and the court conducted an evidentiary hearing on the matter. In situations where, as here, the nonmoving party has had an opportunity to respond and appear at a hearing, "'[a] district court may treat a motion for a temporary restraining order as one for a preliminary injunction[.]'" <u>Barron</u>, 670 F. Supp. 2d at 682 n.8 (quoting <u>5455 Clarkins Drive, Inc. v. Poole</u>, No. 1:09-cv-01841, 2009 WL 2567761, at *2 (N.D. Ohio Aug. 17, 2009)); <u>see also</u> <u>Justice Res. Ctr. v. Louisville-Jefferson Cnty. Metro. Gov't</u>, No. CIV A 07-209, 2007 WL 1302708, at *5 (W.D. Ky. Apr. 30, 2007). Whether the court construes the present motion as one seeking a TRO or a preliminary injunction is of no real consequence, as the applicable legal standards are the same for both. <u>Poole</u>, 2009 WL 2567761, at *2 ("'As long as there is notice to the other side and an opportunity to be heard, the standard for a preliminary injunction is the same as that for a temporary restraining order.'" (quoting <u>Rios v. Blackwell</u>, 345 F. Supp. 2d 833, 835 (N.D. Ohio 2004))).

v. Blackwell, 467 F.3d 999, 1009 (6th Cir. 2006); Gonzales v. Nat'l Bd. of Med. Exam'rs, 225 F.3d 620, 625 (6th Cir. 2000).

    1.   Likelihood of Success on the Merits

"In order to establish a likelihood of success on the merits of a claim, a plaintiff must show more than a mere possibility of success." Six Clinics Holding Corp. II v. CAFCOMP Sys., 119 F.3d 393, 402 (6th Cir. 1997). "However, it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair grounds for litigation and thus for more deliberative investigation." Id. Both plaintiffs bring claims based on separate documents, each containing noncompete provisions and provisions prohibiting disclosure of the plaintiffs' proprietary and confidential business information. In examining whether either ServiceMaster or Terminix, or both, are likely to succeed on the merits of their claims, the court must determine whether the restrictive covenants in the 2003 Contract or the LTIP Agreement are enforceable against Tesh under Tennessee law.[30]

    *a.  Terminix's Claims Under the 2003 Contract*

"In Tennessee, restrictive covenants against competition in employment contracts will be enforced where reasonable under the particular circumstances [which] include time, territory, and

---

[30]The LTIP Plan contains a Delaware choice-of-law provision. The parties have not briefed the choice-of-law issues. Instead, they have relied on Tennessee law in their briefs and do not argue that the law of any other jurisdiction applies.

adequate contractual consideration under the circumstances."
Curtis 1000, Inc. v. Martin, 197 F. App'x 412, 423 (6th Cir. 2006)
(citations and internal quotation marks omitted). Covenants not to
compete "are construed strictly in favor of the employee." Id.
(quoting Vantage Tech., LLC v. Cross, 17 S.W.3d 637, 644 (Tenn. Ct.
App. 1999)) (internal quotation marks omitted). In determining the
reasonableness of a restrictive covenant, a court considers "the
consideration supporting the agreements; the threatened danger to
the employer in the absence of such an agreement; the economic
hardship imposed on the employee by such a covenant; and whether or
not such a covenant should be inimical to public interest."[31]
Vantage Tech., 17 S.W.3d at 644 (quoting Allright Auto Parks, Inc.
v. Berry, 409 S.W.3d 361, 363 (Tenn. 1966)) (internal quotation
marks omitted). The "threshold question is whether the employer
has a legitimate business interest, i.e., one that is properly
protectable by a noncompetition covenant." Id. To prove the
existence of a properly protectable business interest, an employer
must demonstrate "special facts over and above ordinary
competition[,]" such that without the noncompete covenant, the
employee "would gain an unfair advantage in future competition with
the employer." Curtis 1000, 197 F. App'x at 423 (quoting Vantage
Tech., 17 S.W.3d at 644) (internal quotation marks omitted).
Factors to consider in determining whether an employee would have

[31]Tesh does not contend that the noncompete covenant in the 2003
Contract lacks sufficient consideration.

-34-

such an unfair advantage include "(1) whether the employer provided the employee with specialized training; (2) whether the employee is given access to trade or business secrets or other confidential information; and (3) whether the employer's customers tend to associate the employer's business with the employee due to the employee's repeated contacts with the customers on behalf of the employer." Vantage Tech., 17 S.W.3d at 644.

If, after weighing the Vantage Tech./Allright factors, the court concludes that the threatened danger to the employer's protectable interest in the absence of the noncompete covenant outweighs the economic hardship imposed on the employee, the court must then determine whether the duration and geographic scope of the covenant is reasonable.[32] "[T]he time and territorial limits involved must be no greater than necessary to protect the business interest of the employer." Columbus Med. Servs., LLC v. Thomas, 308 S.W.3d 368, 384 (Tenn. Ct. App. 2009) (citing Allright Auto Parks, 409 S.W.2d at 363). "If the scope of the covenant is reasonable as written, it will be enforced as written." Vantage Tech., 17 S.W.3d at 647. "With respect to territorial limitations, covenants that embrace an area in which the employee never performed services are unreasonable unless the employee possesses knowledge of the employer's trade secrets." Id.

*(i) Protectable Business Interest*

---

[32]Tesh does not contend that the eighteen-month duration of the restrictive covenants is unreasonable.

Terminix does not assert that it provided Tesh with any specialized training. <u>Vantage Tech.</u>, 17 S.W.3d at 644-45 (employer does not have a protectable interest in the general knowledge and skill of an employee, even if the employee obtained such knowledge and skill through expensive training). Nor does it contend that Tesh had extensive contact with its customers such that they might associate Terminix's business with Tesh or view him as the "face" of the company. <u>Id.</u> at 645-46. Instead, Terminix argues that it has a legitimate business interest in keeping Tesh from using its confidential and proprietary information at Rollins. Terminix has presented the court with evidence showing that Tesh had access to and possessed certain confidential Terminix and ServiceMaster business information. Tesh possessed customer and pricing information, including thousands of SMAC files. He possessed confidential information pertaining to the mobility system used by Terminix, including confidential contracts between ServiceMaster and Velocitor and issue logs. He also had access to Terminix's 2012 IT strategic plan through an email he received from Cherry.

Even though Tesh had access to and possessed various types of confidential information, the critical inquiry is whether, without the noncompete covenant, Tesh "would gain an unfair advantage in future competition with the employer." <u>Curtis 1000</u>, 197 F. App'x at 423. Plaintiffs have not adequately shown that Tesh's access to and possession of confidential information gives Tesh an unfair advantage or jeopardizes the confidentiality of the plaintiffs'

information.  Tesh has not retained any of the confidential information that he at one time accessed or possessed as a Terminix employee.  While it is true that Tesh possessed over 16,000 SMAC files, these files were used by Tesh strictly in connection with his work on the mobility system.  The customer and pricing information contained on these files were only used by Tesh to run tests or troubleshoot the system.  Tesh has testified that he does not remember the customer information on the SMAC files, and the court believes that it is unlikely that Tesh would be able to recall information contained in the 16,000 plus SMAC files. Further, the documents that were once stored in Tesh's DropBox account were transferred back to ServiceMaster's network or deleted.  They were not provided to Rollins or saved by Tesh.  As for the confidential contracts between ServiceMaster and Velocitor, he did not disclose those contracts to Rollins.  With respect to the 2012 IT strategic plan, Tesh received the email but did not review the plan.  At Rollins, Tesh will use his general knowledge and skill to manage the rollout of a completely different mobility system.

For these reasons, the court finds that there would be little to no "threatened danger" to Terminix if the restrictive covenant is not enforced.  Moreover, any potential threatened danger would not outweigh the economic hardship to Tesh and his family.  He has already sold his house in South Carolina and has moved his family to Atlanta.  He has no other job prospects currently besides the

job at Rollins, and as he testified, he would likely have difficulty finding comparable employment because he does not have a college degree. Therefore, the court concludes that Terminix has not shown that it will likely succeed in enforcing the restrictive covenant in the 2003 Contract.

*(ii) Geographic Scope of the Covenant*

Even assuming, *arguendo*, that Terminix has a properly protectable interest, Terminix is nevertheless unlikely to succeed on the merits because Terminix has not shown that Tesh's employment with Rollins will likely violate the noncompete covenant. The geographic limitation in the covenant is "within a one hundred mile radius" of any county in which Tesh was assigned or performed services for Terminix in the eighteen-month period prior to his termination. Terminix has not presented the court with evidence that Tesh performed work for either Terminix or ServiceMaster in the Atlanta or Fulton County area (or within a 100 mile radius from the borders of Fulton County) within the prior eighteen-month period. Terminix presented evidence that Tesh went to Atlanta on two occasions during this period, but as Tesh testified at the hearing, those trips were not work-related.[33] Crump testified that

---

[33]In April 2011 and August 2012, Tesh traveled to Atlanta for personal reasons. Specifically, from April 2 through April 4, 2011, Tesh went to "Wrestlemania XVII," a professional wrestling event that was held in Atlanta. (TRO Hr'g, Ex. 11.) From August 7 through August 12, 2012, Tesh took personal leave from Terminix to meet with Crump and his relatives in Atlanta. Although plaintiffs also claim that Tesh was in Atlanta from July 14 through July 16, 2011, the evidence at the TRO hearing showed that he was actually in South Carolina playing golf during that time.

Rollins currently has the pilot of its new mobility system in seven cities in New Jersey, Delaware, Maryland, and Pennsylvania. Although it is unclear whether Tesh will be required to travel to these locations, Terminix has not provided any evidence to show that Tesh worked in any of these locations during the eighteen-month period prior to his termination.[34]

        *b.   ServiceMaster's Claims Under the LTIP Agreement*

For the same reasons discussed in the section above, the court finds that ServiceMaster has not shown a likelihood of success on its claims under the LTIP Agreement because (1) there is little to no threatened danger to ServiceMaster if the noncompete covenant is not enforced; and (2) any potential threatened danger would not outweigh the economic hardship to Tesh and his family. Furthermore, the court finds that the geographic scope of the LTIP Agreement's noncompete covenant is unreasonably broad, considering the scope of the work Tesh performed. "If the scope [of a covenant

---

[34]Terminix claims that "Tesh's job duties were national in scope" because the Mission System is used by Terminix's employees nationwide and because Tesh regularly traveled to Terminix locations in several other states. Based on the broad reach of Tesh's duties and his extensive travel, Terminix argues that Tesh should be prohibited from working for a competitor anywhere in the United States. Terminix's strained construction is inconsistent with the plain and unambiguous language of the noncompete provision. <u>Realty Shop, Inc. v. R.R. Westminster Holding, Inc.</u>, 7 S.W.3d 581, 597 (Tenn. Ct. App. 1999) (contractual terms must be afforded "their natural and ordinary meaning," should be construed "in the context of the entire contract," and "courts should . . . avoid strained constructions that create ambiguities where none exist.")

not to compete] is unnecessarily burdensome to the employee . . .
it will be enforced only 'to the extent that [it is] reasonably
necessary to protect the employer's interest . . . .'" <u>Vantage</u>
<u>Tech</u>., 17 S.W.3d at 647 (quoting <u>Cent. Adjustment Bureau, Inc. v.</u>
<u>Ingram</u>, 678 S.W.2d 28, 37 (Tenn. 1984)). "With respect to
territorial limitations, covenants that embrace an area in which
the employee never performed services are unreasonable unless the
employee possesses knowledge of the employer's trade secrets." <u>Id.</u>
In this case, there is no evidence that Tesh has knowledge of the
plaintiffs' trade secrets. There is no evidence that Tesh ever
performed work for the plaintiffs in the Atlanta area. Thus, the
court finds that the territorial limit in the noncompete covenant,
which purports to prohibit Tesh from working for a competitor
anywhere in the United States, is unreasonable, unnecessarily
burdensome, and would impose an undue hardship on Tesh.[35]

In sum, the court finds that the likelihood of success on the
merits factor weighs in favor of denying the TRO.

2. <u>Irreparable Harm to Plaintiffs</u>

In order to obtain injunctive relief, a plaintiff must also
show that it will suffer irreparable harm without such relief.
"Such harm must be 'likely,' not just possible." <u>Tri-County</u>
<u>Wholesale Distrib., Inc. v. Wine Grp., Inc.</u>, No. 10-4202, 2012 WL

---

[35]Tesh also argues that the LTIP Agreement and LTIP Plan expired at
the end of 2009. The court need not reach this issue, as it finds
that the territorial limit is unreasonable and unnecessarily
burdensome.

2478357, at *5 (6th Cir. June 29, 2012). "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." <u>Overstreet</u>, 305 F.3d at 578; <u>see also</u> <u>Certified Restoration Dry Cleaning Network</u>, 511 F.3d at 550. For the same reasons discussed in Section B(1)(a)(i) above, in which the court discussed at length the lack of threatened danger to the plaintiffs, the court likewise finds that the plaintiffs have not shown that they will suffer irreparable harm. Therefore, this factor weighs in favor of Tesh and denying the TRO.

### 3. <u>Public Interest and Balancing the Harms</u>

Finally, the court must consider whether issuing a TRO will cause "substantial harm to others," and the court must consider the public interest. <u>Leary</u>, 228 F.3d at 736; <u>Int'l Mgmt. Sec. Group, Inc. v. Sawyer</u>, No. 3:06cv0456, 2006 WL 1638537, at *8 (M.D. Tenn. June 6, 2006). As discussed in Section B(1)(a)(i), Tesh and his family will likely be harmed by the issuance of a TRO, which weighs slightly in favor of denying the TRO. The court is not aware of any compelling public interest concerns at this time.

### III. CONCLUSION

The court finds that the plaintiffs have not shown a likelihood of success on the merits on their claims, and have not shown that irreparable harm is likely to occur if the court does not issue a TRO. No significant public interest concerns exist, and the harm to others factor weighs slightly in favor of Tesh.

The court concludes that a TRO is not warranted in this case, and as a result, the plaintiffs' Motion for TRO is denied.  The court further concludes that ServiceMaster must submit its claims to binding arbitration.

IT IS SO ORDERED.

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

November 8, 2012
Date